UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

EAST WEST BANK,

    Appellant,

v.

RAVELLO LANDING, LLC,

    Appellee.

2:09-CV-02224-PMP-LRL

OPINION

Presently before the Court is Appellant East West Bank's appeal of the United States Bankruptcy Court's order confirming the plan of reorganization for Debtor/Appellee Ravello Landing, LLC. The Court heard oral argument on this matter of August 20, 2010. (Mins. of Proceedings (Doc. #63).)

**I. BACKGROUND**

Debtor Ravello Landing, LLC ("Debtor" or "Ravello") is a limited liability company owned by twenty-two investors. (A0460.) In 2005, Ravello purchased approximately thirty acres of undeveloped land in Henderson, Nevada for $9,900,000. (A0150, A0372.) The property is located near Lake Las Vegas, and is fronted by an unfinished portion of Galleria Drive. (A0371, A0387-88.) The land originally was zoned for single family homes, but Ravello obtained a change in zoning to mixed use. (A0405, A0372, A0170.) The investors planned a mixed use development with commercial buildings on the first floor with the top floors residential, three story condominium units, and a ten story resort hotel at the top of the property. (A0424-25.) The property is situated in a low mountainous area with good views, but which will require special grading work.

(A0428, A0165, A0170-71.) Ravello is permitted to build on seventy-six percent of the property's total area. (A0487-88.) However, the other twenty-four percent can be used for such things as hiking trails. (A0489.) The investors have invested approximately $5.5 million of their own funds in the project. (A0405.)

In 2006, Ravello obtained a loan from East West Bank ("EWB") in the amount of $13,500,000 secured by the property, with a maturity date of June 1, 2008. (Tab G & A0561.) The loan had an interest rate of 9.5% and a default interest rate of 20%. (Tab T & A0758.) The loan also required an interest reserve of eighteen months, which a lender typically would require on raw land that is not generating income. (A0434, A0563.)

Ravello defaulted on the loan, but the parties thereafter entered into a forbearance agreement, wherein EWB agreed to extend the maturity date until March 24, 2009. (Tab H & A0561-62.) The parties amended the forbearance agreement to extend the maturity date to April 14, 2009. (Tab I.) EWB charged Ravello for each extension, and also required Ravello to keep making payments during the extension. (A0562.) Despite the extensions, Ravello again defaulted and EWB therefore set a foreclosure sale, but the day before the sale, Ravello filed for bankruptcy. (A0566-67.)

EWB filed a proof of claim in the amount of $16,648,674.78. (Tab C.) In the proof of claim, EWB estimated the value of the property was $10.5 million dollars and set forth the applicable interest rate as 9.5%. (Id.) EWB was the main creditor in the bankruptcy, and was the only secured creditor. (A0026.) Ravello proposed a First Amended Plan of Reorganization ("Plan"), which placed the creditors in six classes. (Tab D.) Class 1 consisted of EWB's secured claim. (Id.) Class two consisted of other secured claims, of which there were none. (Id.) Class three consisted of priority unsecured claims in the amount of $5,224.34. (Id.) Class four consisted of general unsecured claims in the amount of $25,116.49. (Id.) Class five consisted of the insider claims in the amount of $293,870.00. (Id.) Class six consisted of equity securities, of which there were none. (Id.)

With respect to EWB's claim in class one, the Plan provided that EWB was to retain its lien on the collateral until the loan is paid in full. (Id. at 11.) From the petition date until EWB is paid in full, interest on the unpaid principal continues to accrue at the pre-petition contract rate of 9.5%. (Id. at 11.) The Plan calls for deferral of paying the principal and interest on the EWB loan until the loan is refinanced, the property is sold, or three years, whichever occurs earliest. (Id. at 14.) Thus, interest will continue to accrue during the deferral period, but is not due until one of the three events occurs. (Id.) Debtor may refinance or sell the property only if the sale or refinancing pays EWB all sums due or EWB otherwise agrees. (Id.) During the deferral period, Debtor is required to pay maintenance costs, including real property taxes, insurance, and other costs. (Id.) These fees and costs are to be paid out of an Exit Facility, which consists of $200,000 provided by the investors. (A0021, A0227, A0231, A0418-19, A0231.) If Debtor fails to make any required payments under the Plan, and fails to cure within ten days of notice of default, the party alleging default may seek relief from the Bankruptcy Court. (Tab D.) Upon expiration of the deferral period, if EWB is not paid in full, it may resort to any and all remedies it has under the loan documents and applicable state law. (Id.)

Class four claims were given an initial distribution of a pro rata share of the remainder of the Exit Facility after other items were paid out under the Exit Facility, but were not paid in full and thus were an impaired voting class. (Id.) Upon sale or refinancing of the property, class four members would receive the remaining amount due if any proceeds remained after paying out costs and secured claims. (Id.) Insider claims would be paid pro rata with any remaining proceeds. (Id.)

EWB objected to the Plan and voted against it as an impaired class. EWB argued, among other things, that the Plan was not proposed in good faith, the Plan failed the "best interests of creditors" test, the plan was not feasible, and the plan was not fair and equitable. (Tab E.) The Bankruptcy Court held an evidentiary hearing on confirmation in

October 2009. (Tab L.) At the hearing, Ravello managing member David Wechsler ("Wechsler"), who is a mortgage broker, testified about the project and opined that the property was worth between 25 and 30 million dollars. (A0414, A0471.) Wechsler testified that credit markets are tighter now than they were in 2007 or 2008, banks are not making land loans right now, and are not responding to Ravello's requests to refinance the loan. (A0435-37.)

At the time of the confirmation hearing, the principal on the loan was approximately $16 million, and outstanding interest was approximately $1.2 million. (A0441-42.) In another three years, another $3.5 million in interest will be owed, for a total of approximately $21 million. (Id.) Wechsler testified that banks likely would require a twenty to thirty percent equity cushion over the total amount of the loan, and thus to cover EWB's risk, the value of the property would have to be at least 24 to 25 million dollars. (A0444, A0447.)

Also testifying at the hearing was John Morgan ("Morgan"), a commercial real estate mortgage banker and broker. (A0502.) Morgan testified that the change in zoning to mixed use added substantial value to the property. (A0503.) However, he testified there is a very limited market for placing commercial real estate loans, "there is not a market for land today," particularly for undeveloped property, and new construction is virtually shut down. (A0503, A0505.) Morgan testified that in 2006 and 2007, he placed $94 million in financing, but in the prior twelve months he placed only $2.7 million, and none of that amount was for undeveloped land. (A0505-06.) Morgan also testified that even in more normal economic times, lenders typically require a higher equity cushion for undeveloped land than for developed land, and usually would require a 50 percent reserve. (A0507-08.) Morgan testified he never had seen a market so dry but he believes it will "return to a more normal phase in the next 6 to 12 months." (A0508.)

///

Debtor's appraiser, George Jordan ("Jordan"), a certified real estate appraiser in Texas, also testified. (Tab B.) According to Jordan, the highest and best use for the property is mixed use development. (A0145.) Jordan valued the property at $28.51 per square foot or $28,575,000 after one year of marketing, and $38,100,000 after three years of marketing. (A0149.) Jordan used the sales comparison approach to value the property. (A0195.) However, because there have been so few sales recently, he had to use comparable sales dating from 2007 and one from 2008, with a range of $27.07 to $32.20 per square foot. (Id.) According to Jordan, prices for mixed use development have leveled off or become more stabilized due to problems in the national and local economies because both buyers and sellers have decided to sit back and wait. (A0205, A0641.)

EWB's appraiser, Heidi Kent ("Kent"), valued the property substantially lower, at $10,070,000. (A0234.) According to Kent, the highest and best use for the property right now is speculative holding until development is feasible. (A0240.) Kent testified that mixed use is a good idea for the property generally, but given the deterioration of the Las Vegas residential and commercial real estate markets, it is not financially feasible at this time. (A0257.) She noted that nearby Lake Las Vegas was in bankruptcy reorganization, and she identified a number of failed, canceled, or halted mixed use projects in the valley. (A0249, A0257.) Like Jordan, Kent used the sales comparison approach, and she likewise had to use dated comparable sales. (A0259-60.) Kent stated that these older prices are not reflective of the current market because developers and investors are not participating in the market right now, loans are difficult to obtain, lots of equity is needed to obtain a loan, and market conditions are declining. (A0259.) Thus, she also considered current listings. (Id.) The range of prices for the comparable sales was $23.12 to $36.25 per square foot. (A0260.) The two listings were for $18.22 per square foot and $6.59 per square foot. (Id.) Kent ultimately settled on a valuation of $9.75 per square foot for the subject property. (A0270.) In rebuttal, Jordan indicated that an appraiser should use a listing only as "a

last-ditch effort to gain data. You much prefer to use the sales because this is where an actual decision by a buyer and seller have been made. Using listings is normally something just to back up the sales that are available or to show trends in the market." (A0637.)

At the conclusion of the evidentiary hearing, the Bankruptcy Court confirmed the Plan. (A0725.) Specifically, the Bankruptcy Court found the Plan was offered in good faith, the value of the property at all times would cover EWB's claim, and the Plan was feasible. (A0728, A0730.) The Bankruptcy Court acknowledged there currently is no market for undeveloped land, but concluded that does not doom reorganization because the law allows the Court to estimate or project value as if there was a market because "[o]therwise, there could be no reorganization when the times are toughest, and that would be contrary to the spirit and intent of the reorganization provisions." (A0731-32.)

In determining the property's value, the Bankruptcy Court rejected Kent's valuation, and found Jordan more credible, "because I think some of [Kent's] methodology such as the square footage was incorrect," and "her overreliance on listings in this market without a full and ready explanation of that hurt her credibility as did the fact that she was asked some questions for which she seemed unprepared to answer . . . ." (A0734-35.) The Bankruptcy Court noted that Jordan had problems of his own, including that he is from out of town, and he did not mention the Lake Las Vegas bankruptcy. (A0735.) The Bankruptcy Court nevertheless concluded Jordan "had a better fix on the situation." (Id.)

The Bankruptcy Court did not accept Jordan's valuations in toto, however. Instead, the Bankruptcy Court set its own value at somewhere between $20 and $22 per square foot, for a total value somewhere between 26 to 29.5 million dollars. (A0735.) According to the Bankruptcy Court, "[a]t that valuation, there is somewhere between a 60-percent to 70-percent equity cushion for the present value of the claim which is more than adequate upon which to confirm the plan." (A0735-36.) Additionally, the Bankruptcy Court concluded that even including interest for the next three years, EWB's claim would

1  reach approximately $23 million, and there still would be a 14 to 25 percent equity cushion,
2  assuming no appreciation in the property's value.  (A0737.)
3         As to the interest rate, the Bankruptcy Court concluded a 9.5 percent interest rate
4  was appropriate, as it reflects the parties' contractual minimum pre-petition and provides an
5  appropriate premium over prime rate.  (A0685, A0736.)  The Bankruptcy Court expressed
6  its view that this was not a negative amortization plan, it was a hold plan, and "[t]hus, it
7  really doesn't comply with 1129(b)(2)(A)(1) because that requires some deferred payments.
8  Unless you think the property is a deferred payment, this doesn't comply with that."
9  (A0737.)  "Notwithstanding that, I think fair and equitable which is the standard itself is
10 found in paragraph 1, not paragraph 2 of 1129(b)."  (A0737-38.)  The Bankruptcy Court
11 nevertheless went through the ten factor test for approving a negative amortization plan,
12 finding that each either was neutral or favored confirming the Plan, except for
13 acknowledging that the original loan did not include negative amortization.  (A0742.)
14        EWB now appeals the confirmation order, arguing the Bankruptcy Court erred in
15 its valuation of the property.  Specifically, EWB argues the Bankruptcy Court clearly erred
16 in finding Ravello's appraiser more credible than EWB's appraiser.  EWB contends that as
17 a consequence of the erroneous valuation, the Plan is not fair and equitable because the
18 value of the property, when properly evaluated, does not ensure EWB will be paid in full in
19 the future.  Additionally, EWB contends the erroneous valuation makes the Plan not
20 feasible.  Finally, EWB argues the valuation led to the Bankruptcy Court finding sufficient
21 value to cover EWB's secured claim, whereas a proper value would have left EWB with an
22 unsecured claim for the deficiency.  As such, it would have had voting rights in the
23 unsecured class, and would have voted against the Plan in the only impaired class that
24 accepted the Plan.
25        Second, EWB contends that even if the valuation is correct, the Plan still is not
26 fair and equitable because it does not comply with 11 U.S.C. § 1129.  EWB contends that a

plan must meet both § 1129(b)(1) and § 1129(b)(2)(A) to be fair and equitable. EWB notes that the Bankruptcy Court conceded the Plan did not comply with § 1129(b)(2)(A), but nevertheless confirmed the Plan under § 1129(b)(1). EWB contends that, as a matter of law, a plan must conform to both sections to be fair and equitable, and reversal therefore is required. Finally, even assuming the valuation is correct and that the Bankruptcy Court could confirm the Plan under § 1129(b)(1) only, EWB contends the Plan nevertheless is not a fair and equitable negative amortization plan. EWB argues the Bankruptcy Court erroneously weighed nearly all the relevant factors, and thus reached an erroneous result.

Ravello responds that EWB has failed to meet its burden of showing the Bankruptcy Court's factual findings, including valuation, were clearly erroneous. Additionally, Ravello argues that the fair and equitable standard in § 1129 does not require that the Plan satisfy both § 1129(b)(1) and § 1129(b)(2)(A). Ravello also contends the Bankruptcy Court correctly weighed all relevant factors. Finally, Ravello argues EWB raises issues on appeal that were not before the Bankruptcy Court.

## II. STANDARD OF REVIEW

The Court reviews de novo the Bankruptcy Court's conclusions of law, "including its interpretation of the Bankruptcy Code." In re Rains, 428 F.3d 893, 900 (9th Cir. 2005). The Court reviews the Bankruptcy Court's factual findings for clear error. Id.; Fed. R. Bankr. P. 8013. The Bankruptcy Court's factual findings are clearly erroneous only if the findings "leave the definite and firm conviction" that the Bankruptcy Court made a mistake. In re Rains, 428 F.3d at 900 (quotation omitted). The Court reviews the Bankruptcy Court's decision to confirm a reorganization plan for an abuse of discretion. In re Brotby, 303 B.R. 177, 184 (9th Cir. BAP 2003). "A bankruptcy court abuses its discretion if it applies the law incorrectly or if it rests its decision on a clearly erroneous finding of a material fact." Id. Additionally, although EWB argues otherwise, the Court is satisfied that it may affirm the Bankruptcy Court's decision "on any ground fairly supported

by the record." In re Warren, 568 F.3d 1113, 1116 (9th Cir. 2009).

### A. Valuation of the Property

EWB argues the Bankruptcy Court clearly erred by crediting Jordan over Kent, and thereby finding an inflated value for the property. EWB contends this leads to a host of reasons why the Plan cannot be confirmed, including that it is not fair and equitable, it is not feasible, and led to the erroneous classification of EWB's claim as wholly secured. EWB identifies two major areas where it believes the Bankruptcy Court erred: (1) making a negative credibility finding against Kent based on her use of listings and based on her valuation of net square footage versus gross square footage, and (2) making a positive credibility finding in favor of Jordan despite Jordan's failure to account for local evidence of market decline, his valuation of the property currently based on assumptions the market would improve in the future, his conclusion that today's market was not a true market, and his misapplication of applicable standards. Ravello responds that the valuation is a fact question which this Court reviews for clear error, and EWB has failed to show clear error. Ravello argues the Bankruptcy Court did not fully accept either appraiser's valuation, but added and discounted based on its findings as to each. Ravello further contends that because the valuation is not clearly erroneous, EWB dependent reasons why the Plan is not confirmable do not apply.

The Bankruptcy Court's valuation of a debtor's property is a finding of fact that the Court reviews for clear error. In re Pletz, 221 F.3d 1114, 1116 (9th Cir. 2000); Fed. R. Bankr. P. 8013. The Court also reviews the Bankruptcy Court's credibility determinations for clear error. In re Ashley, 903 F.2d 599, 606 (9th Cir. 1990).

#### 1. Credibility Findings as Between Appraisers

The Bankruptcy Court did not clearly err by making a negative credibility finding against Kent. The Bankruptcy Court did not make a credibility finding against Kent for using the listings generally. Rather, he found her "overreliance" on the listings hurt her

9

credibility. The listings were substantially below the comparable sale prices, and the Bankruptcy Court determined that Kent overrelied on the low listing prices to significantly mark down her valuation from the comparable actual sales. Additionally, even if the Bankruptcy Court misapprehended Kent's methodology with respect to gross versus net square footage, the Bankruptcy Court also noted that Kent was unprepared to answer certain questions which the Bankruptcy Court believed were standard and appropriate questions. Thus, the Bankruptcy Court gave a third reason for discounting Kent's testimony, which EWB does not challenge.

With respect to crediting Jordan, the Bankruptcy Court made a specific comment that Jordan had his own credibility problems, including the fact that he was not from Nevada and failed to account for certain local evidence of market decline such as the bankruptcy at Lake Las Vegas. However, the Bankruptcy Court ultimately found him more credible. The Bankruptcy Court nevertheless did not wholly accept Jordan's valuation, either. Jordan valued the property at $28.51 per square foot. The Bankruptcy Court valued the property at $20 to $22 per square foot. The Bankruptcy Court therefore discounted the property's value from Jordan's appraisal, making adjustments based on a weighing of credibility as between the two appraisers as well as testimony from the other witnesses. The Bankruptcy Court therefore did not clearly err by overall falling somewhere in between the two very divergent appraisals, even if he ultimately ended up closer to Jordan's appraisal than Kent's. EWB has failed to meet its burden of showing clear error with respect to the credibility and fact findings relating to the competing experts.

2. Intrinsic Value

EWB contends the Bankruptcy Court erred by concluding that when there is no market, the Bankruptcy Code permits the Court to estimate or project what a market would be, citing to what EWB refers to as the "intrinsic value" cases. EWB contends this was error because those cases are useful for determining market value when a drop in value is

caused by the filing of the bankruptcy itself.  EWB contends the use of the intrinsic value cases is inappropriate when it is just a depressed economy generally that is affecting market prices.  Ravello responds that EWB cites to no case which would prohibit the Bankruptcy Court from considering that a current value might be artificially low and not reflective of the property's intrinsic value.  Ravello contends the principle in the intrinsic value cases is not limited to the valuation of equity securities.

Pursuant to 11 U.S.C. § 506(a)(1),

> [a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim.

Section 506(a)(1) also provides that the value of the secured claim "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property."  Generally, the property's value, and hence the amount of the secured claim, is "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller."  Assocs. Commercial Corp. v. Rash, 520 U.S. 953, 960 (1997).

In the context of setting the value of securities of a bankrupt entity, courts have concluded that although the market price usually will reflect the willing buyer, willing seller value, sometimes the market price is artificially low because the bankruptcy itself is having an impact on decreasing the price.  Courts therefore have made an adjustment to the valuation to reflect market conditions absent the negative impact of the bankruptcy.  See Matter of Penn Cent. Transp. Co., 596 F.2d 1102, 1115-16 (3rd Cir. 1979) (noting that the investing public's perception of a reorganized debtor's future prospects may be "unduly distorted by the recently concluded reorganization and the prospect of lean years for the enterprise in the immediate future"); Matter of New York, N. H. & H. R. Co., 4 B.R. 758, 792 (D. Conn. 1980) (noting that although market price usually will control, market had

"underrated" the securities due to the "stigma of bankruptcy"); In re Missouri Pac. R. Co., 39 F. Supp. 436, 446 (E.D. Mo. 1941) (noting that uncertainty and extended reorganization process which depressed market value of securities made it "quite impossible at the present time to make any fair appraisal" of the securities' market value). A similar concept applies when setting the value of real property in bankruptcy. In setting the value of property which the debtor retains subject to a lien, "the proper valuation is fair market value, not foreclosure value." In re Kim, 130 F.3d 863, 865 (9th Cir. 1997).

Courts have considered the issue in a related situation in determining what would be an appropriate interest rate to apply to payments the debtor is to make over time where no actual market exists for the loan. For example, in Till v. SCS Credit Corp., the Supreme Court noted the challenge facing bankruptcy courts in selecting an appropriate interest rate when the debtor is repaying a debt over time such that it adequately will account for the time value of money and the risk of nonpayment. 541 U.S. 465, 474 (2004). In a footnote, the Court stated "there is no readily apparent Chapter 13 'cram down market rate of interest'" because "there is no free market of willing cramdown lenders." Id. at 477 n.14. The Court stated that the "absence of any such market obligates courts to look to first principles and ask only what rate will fairly compensate a creditor for its exposure." Id.

Lower courts have engaged in this analysis in practice. For example, in In re Aztec Co., both the debtor's and creditor's experts testified that "there is no market for the loan proposed by this plan" due to the amounts involved, the security necessary, and the debtor's prior history of credit unworthiness. 99 B.R. 388, 391 (Bankr. M.D. Tenn. 1989). The bankruptcy court did not find the plan unconfirmable, however. Instead, it considered expert testimony on how lenders price percentage points over the treasury bill rate, including the addition of basis points to reflect factors such as the risk involved and the lender's cost of funds. Id. The court then set an applicable interest rate, two percent above the applicable treasury bill rate, as "the least that any lender in any possible market for this

loan would be willing to consider." Id.; see also In re Griswold Bldg., LLC, 420 B.R. 666, 693 (Bankr. E.D. Mich. 2009) (concluding, in response to parties' respective interest rate experts' testimony that no commercial real estate loans were available in the credit market for property like the debtor's, that the court would apply a "formula approach to determine an appropriate cramdown interest rate"); In re Bloomingdale Partners, 155 B.R. 961, 977-78 (Bankr. N.D. Ill. 1993) (stating that an efficient market for loans equaling 100% of the collateral's value do not exist, so the court had to choose a rate under a "theoretical model for a well-functioning market").

Another bankruptcy court reached a similar conclusion in In re Eastland Partners Limited Partnership, 149 B.R. 105, 106 (Bankr. E.D. Mich. 1992). There, the evidence established that no current market existed for similar loans, particularly considering the risk factors associated with the debtor's situation. Id. The creditor argued that "because no reasonable lender would make the proposed loan to this debtor, no market rate of interest exists, and no plan providing for a 'forced loan' can be confirmed." Id. The bankruptcy court rejected that argument because it was against the weight of authority, and because denying confirmation "just because there is no market for similar loans would give the market permission to repeal § 1129(b)(2) of the Bankruptcy Code," because if a market for such a loan actually existed, there would be no need to impose a cramdown rate. Id.; see also In re Birdneck Apartment Assocs., II, L.P., 156 B.R. 499, 508-09 (Bankr. E.D. Va. 1993) (concluding that expert testimony that no actual market for a loan on these terms existed "does not end the inquiry," because if a market existed the debtor could obtain a loan and cramdown would be unnecessary; court therefore must focus "on a hypothetical market rate of interest for a loan of similar terms").

This concept in setting a cramdown interest rate where no market for such a loan exists is transferrable to the situation of valuing real property where no market for such property exists. Cf. U.S. v. Miller, 317 U.S. 369, 374-75 (1943) (noting that in

condemnation proceeding, where property "has no market resort must be had to other data to ascertain its value"); U.S. v. 50.822 Acres of Land, More or Less, in Nueces County, State of Tex., 950 F.2d 1165, 1168 (5th Cir. 1992) (stating, in condemnation proceeding, that "[w]here property has no market value, the district court may consider other data to ascertain value, . . . however, the district court may consider only reasonably probable events that affect value"). Otherwise, as the Bankruptcy Court noted in this case, a plan would not be capable of confirmation when things are at their worst, which is not the intent of the Bankruptcy Code.

Here, the testimony established that at the time of the confirmation hearing, there was no market for undeveloped land. Banks were not making loans for such property. The market was so inactive that both appraisers had to use comparable sales dating back to 2007 and only one in 2008. Both appraisers attested to the fact that most of the market was not participating, as investors were waiting for land prices to fall even further, and owners were holding out for things to improve if they could afford to do so. Consequently, the Bankruptcy Court did not clearly err in determining that no actual market then existed for this property, nor did it clearly err in resorting to a hypothetical market to determine the Property's value.

Moreover, upon making this determination, the Bankruptcy Court did what it would do under any valuation determination, even if there was an actual market for this property. It took two competing appraisals, heard testimony from the appraisers and other witnesses, made adjustments to the price based on the various pluses and minuses associated with the property and the dated comparable sales, and came up with a valuation that landed somewhere between the two appraisals. EWB has not met is burden in establishing the Bankruptcy Court clearly erred by not setting the price lower than it did. See Miller, 317 U.S. at 374-75 (stating that where property has been taken in condemnation, and property in its vicinity "has not in fact been sold within recent times, or in significant

14

amounts," the application of the willing buyer, willing seller market value "involves, at best, a guess by informed persons"). Because the Bankruptcy Court's valuation was not clearly erroneous, none of EWB's dependent reasons for finding the Plan unconfirmable have merit.

### B. Cramdown

EWB contends that even if the Bankruptcy Court properly valued the property, the Plan still is not fair and equitable under the cramdown provision. According to EWB, a Plan that is being crammed down must meet the fair and equitable standard as set forth in § 1129(b)(1) and at least one of the provisions in § 1129(b)(2)(A). Ravello responds that EWB misreads the statutory section, and the fair and equitable standard is contained in § 1129(b)(1), while § 1129(b)(2)(A) contains a nonexclusive list of ways the fair and equitable standard may be met.

Under 11 U.S.C. § 1129(a)(8), a bankruptcy court generally may not confirm a Chapter 11 plan of reorganization if any impaired class of creditors votes to reject the plan. However, a plan may be "crammed down" over the objection of a dissenting creditor class under § 1129(b). Section 1129(b)(1) provides as follows:

> [i]f all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

Section 1129(b)(2) provides:

> For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
> (A) With respect to a class of secured claims, the plan provides--
>     (i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>         (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed

>amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
>   (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or
>   (iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A). The United States Court of Appeals for the Ninth Circuit has interpreted this to mean that "[t]o be 'fair and equitable' [a] plan must satisfy, with respect to secured claims, one of the . . . three tests" set forth in § 1129(b)(2)(A). In re Arnold & Baker Farms, 85 F.3d 1415, 1420 (9th Cir. 1996); In re Ambanc La Mesa Ltd. P'ship, 115 F.3d 650, 653 (9th Cir. 1997) ("The 11 U.S.C. § 1129(b)(2) cramdown provision specifies that a fair and equitable plan provide one of three alternatives for the holders of secured claims."). Other courts similarly have described § 1129(b)(2)(A) as three alternative minimum requirements for finding a plan fair and equitable with respect to secured creditors. See Matter of Briscoe Enters., Ltd., II, 994 F.2d 1160, 1168 (5th Cir. 1993); In re SM 104 Ltd., 160 B.R. 202, 231 (Bankr. S.D. Fla. 1993); In re Weinstein, 227 B.R. 284, 293 (9th Cir. BAP 1998). This interpretation is consistent with the statutory language, which refers to the three alternatives in § 1129(b)(2)(A) as "requirements."

   While meeting one of the three requirements in § 1129(b)(2)(A) is necessary, it may not be sufficient for a fairness finding. See Matter of Briscoe Enters., Ltd., II, 994 F.2d at 1168. Section 1129(b)(2) states that "the condition that a plan be fair and equitable with respect to a class includes the following requirements . . . ." Under § 102(3), the word "includes" is "not limiting." Thus, some courts have held that "simple technical compliance with one of the three options in 1129(b)(2)(A) may not necessarily satisfy the fair and equitable requirement." In re Monarch Beach Venture, Ltd., 166 B.R. 428, 434 (C.D. Cal. 1993); see also In re Freymiller Trucking, Inc., 190 B.R. 913, 915 (Bankr. W.D. Okla.

1996). Ravello's reliance on Collier on Bankruptcy, which is persuasive but not controlling authority, is unavailing in the face of controlling and other persuasive authority on the meaning of § 1129(b)(1) and § 1126(b)(2)(A).

Here, in making its findings regarding the fair and equitable requirement at the confirmation hearing, the Bankruptcy Court stated the following:

> [T]his really doesn't comply with 1129(b)(2)(A)(1) because that requires some deferred payments. Unless you think that the property is a deferred payment, this doesn't comply with that.
> Notwithstanding that, I think fair and equitable which is the standard itself is found in paragraph 1, not paragraph 2 of 1129(b). And I think this type of plan under these circumstances is fair and equitable, and that it does return the value with an appropriate risk to the secured creditor.

(A0737-38.) The Bankruptcy Court thus abused its discretion in confirming the Plan because it relied solely on § 1129(b)(1), which is an incorrect application of the law. The Bankruptcy Court confirmed the Plan despite making a specific finding that the Plan does not comply with § 1129(b)(2)(A)(i) because it does not include deferred payments. The Bankruptcy Court did not make any findings as to whether the Plan satisfied either of the other two of the alternative requirements under § 1129(b)(2)(A), instead concluding that compliance with § 1129(b)(2)(A) was not required.

Whether a plan meets one of the three requirements in § 1129(b)(2)(A) is a question of law which this Court reviews de novo "because it requires analysis of the meaning of the statutory language in the context of the Bankruptcy Code's 'cram down' scheme." In re Arnold & Baker Farms, 85 F.3d at 1421. Consequently, even though the Bankruptcy Court erred by not making a finding under § 1129(b)(2)(A), the Court reviews de novo the question of whether the legal requirements of any of the three alternative minimum requirements have been met, and may affirm on any basis supported by the record.

The Bankruptcy Court stated this Plan does not meet § 1129(b)(2)(A)(i), and the

Court agrees. This first alternative requires "deferred cash payments." Courts have interpreted this to mean a stream of payments over time. See Matter of Briscoe Enters., Ltd., II, 994 F.2d at 1169 ("Deferred cash payments consist of an appropriate interest rate and an amortization of the principal which constitutes the secured claim."); U.S. v. TM Bldg. Products, Ltd., 231 B.R. 364, 372 (S.D. Fla. 1998) ("'Deferred cash payment' has been defined to mean periodic payments, the interval of which is determined by balancing the circumstances of the debtor with the reasonable right of the creditor to receive prompt payment of its claim." (quotation omitted)); In re Weinstein, 227 B.R. at 294 ("Subsection (II) of § 1129(b)(2)(A)(i) guarantees an electing creditor a stream of payments equal to its total claim."). This is consistent with the statutory language, which refers to payments in the plural form. As set forth in § 102(7), the "singular includes the plural," but the plural does not include the singular. See H.R. Rep. 95-595, 316, 1978 U.S.C.C.A.N. 5963, 6273 (stating that while paragraph (7) specifies that the singular includes the plural, the "plural . . . generally does not include the singular. . . . When an item is specified in the plural, the plural is intended"). Consequently, a lump sum payment upon sale, refinance, or foreclosure at the end of the deferral period does not satisfy the requirement of deferred cash payments. The Plan is not confirmable under the first alternative requirement.

No one asserts this Plan meets the second alternative requirement, as the Plan does not contemplate the sale of the property free and clear of EWB's lien, with EWB's lien to attach to the proceeds of such sale. Consequently, the Plan is not confirmable under the second alternative requirement.

The third alternative requirement is that the secured claimant realize the "indubitable equivalent" of its secured claim. Whether a secured claimant receives the indubitable equivalent of its secured claim is determined on a case-by-case basis. In re Arnold Baker Farms, 85 F.3d at 1421. Indubitable means "too evident to be doubted." Id. (quotations omitted). The standard is focused on two factors, the time value of money and

insuring the safety of the principal.  In re Am. Mariner Indus., Inc., 734 F.2d 426, 433 (9th Cir. 1984); In re Philadelphia Newspapers, LLC, 599 F.3d 298, 311 (3d Cir. 2010) stating that what is "really at stake in secured credit" is "repayment of principal and the time value of money" (quotation omitted)).

        Although indubitable equivalence ultimately is a question of law, the legal inquiry is informed by the Bankruptcy Court's factual findings.  Because the Bankruptcy Court did not make either factual findings or legal conclusions regarding indubitable equivalence, and the parties did not argue the issue below, the Court concludes that remand is appropriate.  The Court therefore REVERSES and REMANDS to the Bankruptcy Court for further proceedings consistent with this Opinion.

DATED: September 7, 2010

_____
PHILIP M. PRO
United States District Judge